UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| TERRANCE JOHNSON, | : | Case No. 3:18-cv-59 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

In March 2005, the Social Security Administration found that Plaintiff Terrance Johnson was under a disability as of December 1, 2004. Upon review in December 2010, his disability status continued. On April 27, 2015, his status changed—the Administration found he was no longer under a disability. Plaintiff challenged the non-disability determination, and after a hearing, Administrative Law Judge (ALJ) Gregory G. Kenyon confirmed that Plaintiff was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

Plaintiff brings this case challenging the Social Security Administration's determination that he is no longer disabled.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II. Background

On April 27, 2015, Plaintiff was forty-seven years old and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). He left school in the eleventh grade and thus has a limited education. *See* 20 C.F.R. § 416.964(b)(3).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that he began having seizures when he was nine years old. (Doc. #6, *PageID* #71). He has them about twice a month and they can be brought on by stress. *Id.* at 71, 73. Before beginning his medication, Dilantin, he had experienced seizures more often. *Id.* at 71. Plaintiff never knows when he will have one. *Id.* at 72. Because he is unconscious during these episodes, other people have to tell him what happened. *Id*. After having a seizure, Plaintiff sometimes gets headaches and is always tired. *Id*. It takes him two hours to recover. *Id.* at 72-73.

Plaintiff also has Type II Diabetes. He has some numbness in his feet. *Id.* at 74. He takes medication rather than insulin. *Id.* at 75-76. His eyes get blurry approximately

2

once a month. *Id.* at 76. He recently got new glasses that are tinted to help with lights that bother his eyes. *Id.* at 76. He has hypertension that causes headaches. *Id.* at 88.

Plaintiff had an operation on his left foot to remove a bunion. *Id.* at 74. He still has some pain from the screw they used during the operation. *Id.* at 73-75. Sometimes he has trouble standing and walking and has to hop around on his right leg. *Id.* at 77. Therapy helped "a little bit" with the pain but he sometimes limps and has to use a walker or a cane. *Id.* at 78. If his foot hurts or he is, for example, going to the grocery, he uses his walker. *Id.* Plaintiff estimated that he could walk a mile without his walker and stand for a couple of hours. *Id.* at 79-80.

Plaintiff has also struggled with mental health problems. He has a history of depression. Since his wife moved out, when he is home alone, he gets depressed. *Id.* at 81. He stays busy to keep himself from getting depressed. For instance, he builds model cars, cleans, vacuums, walks, goes to the park, and calls people. *Id.* at 81-82. At the time of the hearing, he had not had any recent crying spells. But he has been "dealing with a lot of stuff"—he lost his grandma, uncle, and aunt within a year. *Id.* at 82. He is sad every day. *Id.* at 92. In the past, he had thoughts of hurting himself. *Id.* His medications have helped him and at the time of the hearing, he was not having those thoughts. *Id.* at 93. However, in September 2016 (about six months before the hearing), when his wife left, he "grabbed the biggest knife in the kitchen and [] was going to stab [him]self." *Id.* His neighbor unexpectedly came over and he stopped. *Id.* at 93-94.

When Plaintiff spends too much times in his apartment by himself, he starts to feel like the walls are closing in on him and he has to leave. *Id.* at 98-99. He thinks they're

3

closing in because he spent time locked in a cell that he could not get out of. *Id.* at 99. When he goes to Rocking Horse Community Health Center, he always asks that the door be left open or at least cracked because he feels the walls closing in. *Id*.

Plaintiff has trouble concentrating. He can read a book for an hour unless he cannot figure out a word. *Id.* at 83. In that case, he gets frustrated, closes the book, and finds something else to do. *Id*. He also has difficulty concentrating on drawing or painting for more than a couple hours. *Id*. He is able to work on model cars for one hour at a time. *Id.* at 84.

Plaintiff sometimes has difficulty interacting with other people. *Id*. He does not like to be in big groups of people because it reminds him of when he was in jail. *Id*. If he goes somewhere and there are a lot of people, he tries to stay away. *Id*. He is able to grocery shop with people around because he can focus on what he needs to buy. *Id*. He gets upset with and goes off on his neighbors when they "say something stupid." *Id.* at 85-86. Plaintiff gets angry and irritable about once a week. *Id.* at 95. When his wife lived with him, she would aggravate him so much that he would have to leave to cool down. *Id.* at 85. His wife planned to bring him divorce papers to sign on the day after the hearing. *Id.* at 68.

Plaintiff has trouble sleeping. *Id.* at 86. He usually goes to bed at nine, wakes up around midnight to use the restroom, and then cannot go back to sleep. *Id*. On average, he sleeps four hours per night. *Id*. When asked what interrupted his sleep, Plaintiff explained, "I'll be having these --- I don't know if they [are] dreams or what …." *Id.* at 90." During the dream-like disturbances, he hears people talking about him and saying

4

what they are going to do to him. *Id.* at 91. He gets scared "because I think they [are] going to really just get up and start doing something to me." *Id*. He has these disturbances about once a week. *Id.* at 92. He speaks to a spiritual director about the dreams and she tells him what he needs to do. *Id.* at 91.

He left school when he was in the eleventh grade. *Id.* at 69. While in school, he was in special education classes. *Id*. Plaintiff estimated that he has a second-grade reading level. *Id*. He can write "pretty well" in print but not cursive. *Id*. He has difficulty reading a newspaper but does read his bible. *Id.* at 69-70. Plaintiff is able to take care of all of his personal needs. *Id.* at 87.

Although Plaintiff indicated that he is able to drive, he has never had a valid driver's license. *Id.* at 89. He had to take an oral test to get a permit. *Id*. Unfortunately, he did not have a car to practice and the person who was supposed to help was never around. *Id.* at 90. Plaintiff does not have any money. Once or twice a month, he does yardwork in the afternoon for a man who sometimes needs help. *Id.* at 88, 98.

**B.     Medical Opinions**

*i. Daniel Hrinko Psy.D.*

Dr. Hrinko, a consulting psychologist, evaluated Plaintiff on November 10, 2010. *Id.* at 391-94. Dr. Hrinko noted that Plaintiff's speech was quiet in volume, slow and hesitant in pace, and appropriate in content. *Id.* at 392. He had significant problems with eye contact and fidgeted throughout the evaluation. *Id.* Dr. Hrinko found that Plaintiff showed "clear evidence of auditory hallucinations." *Id.* at 393. He hears voices that are sometimes pleasant and cooperative and, at other times, direct him to harm himself. Dr.

5

Hrinko opined that Plaintiff had, at best, borderline intellectual capabilities. *Id*. He diagnosed schizoaffective disorder and polysubstance dependence, in remission by report. *Id*.

Dr. Hrinko opined Plaintiff's ability to relate with coworkers and supervisors and to withstand the stress and pressures of employment is markedly impaired. *Id.* at 394. His ability to maintain attention to perform simple and repetitive tasks and to understand and follow directions is moderately impaired. *Id.*

### ii. *George O. Schulz, Ph.D.*

Dr. Schulz, a consulting psychologist, evaluated Plaintiff on April 5, 2015. *Id.* at 530-39. Dr. Schutz noted that Plaintiff was cooperative with moderate eye contact. His mood was normal and his affect was appropriate. When Dr. Schulz asked Plaintiff the nature of his disability, he responded that he had seizures and was diabetic. *Id.* at 531.

Dr. Schulz found no evidence of a mental disorder. He opined that Plaintiff "is expected to be able to understand and apply instructions in the work setting within the borderline to low average range of intellectual functioning." *Id.* at 538. He is mentally capable of completing routine or repetitive activities of daily living tasks at home, in the community, or in a job setting. But, "he is likely to experience some objective performance concerns by employers." *Id.* Plaintiff would likely have some difficulties in responding to coworkers and supervisors in a work setting. He is expected to respond appropriately to work pressure. *Id.* at 538-39.

### iii. *Cindy Matyi, Ph.D., & Leslie Rudy, Ph.D.*

Dr. Matyi reviewed Plaintiff's records on April 24, 2015. *Id.* at 549-61. Dr.

6

Matyi found that Plaintiff had a non-severe anxiety disorder. He has a mild restriction in activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. *Id.* at 559. Dr. Matyi opined, "SMI [significant medical improvement] is established by the lack of hallucination or suicide attempts." *Id.* at 561.

Dr. Rudy reviewed Plaintiff's records on August 12, 2015 and affirmed Dr. Matyi's assessment. *Id.* at 666-78.

### III. Standard of Review

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record

7

contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. <u>Continuation of Benefits</u>

"When the cessation of benefits is at issue, as here, the central question is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing 42 U.S.C. § 423(f)(1)). "Improvement is measured from 'the most recent

8

favorable decision' that the claimant was disabled." *Id.* (citing 20 C.F.R. § 416.994(b)(1)(i)). "There is no presumption of continuing disability." *Id.* (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-87 n.1 (6th Cir. 1994)). "Instead, the Commissioner applies the procedures that are outlined in 20 C.F.R. § … 416.994 to determine whether a claimant's disability has ended and that she is now able to work." *Id.*

The Regulations require an ALJ to follow an eight-step analysis to determine whether an individual continues to be under a disability. 20 C.F.R. § 416.994(b)(5). At step one, the ALJ must determine whether the individual has an impairment or combination of impairments which meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the individual's disability continues. If not, the analysis continues to the issue of medical improvement. Specifically, at step two, the ALJ must determine whether there has been medical improvement—"as shown by a decrease in medical severity." *Id.* § 416.994(b)(5)(ii). If there has been improvement, at step three, the ALJ must decide whether the medical improvement is related to the individual's ability to work—"*i.e.*, whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination." *Id.* § 416.994(b)(5)(iii). If there was no medical improvement (at step two) or if the medical improvement is not related to the individual's ability to work (at step three), then, at step four, the ALJ must consider whether any exceptions to the medical-improvement standard apply. *See id.* § 416.994(b)(3)-(4). If no exception applies, the individual's disability continues. If an

exception from the second group applies, the individual's disability will be found to have ended. If there was medical improvement related to the individual's ability to work or if an exception from the first group of exceptions applies, the evaluation continues to step five.

At step five, the ALJ must determine whether all of the individual's impairments in combination are severe. If all the impairments in combination do not significantly limit the individual's ability to do basic work activities, the impairments are not severe and the individual will no longer be considered disabled. If the individual's impairments are severe, then at step six, the ALJ must assess the individual's residual functional capacity based on his impairments and determine whether he can still do his past work. If so, his disability has ended. If the individual is unable to do past work, then the ALJ, at step seven, must determine whether the individual can do other work. If the individual cannot, his disability continues. If he can, his disability has ended. At step eight, if there is not enough information to determine whether the individual can do his past work, the ALJ considers whether he can adjust to other work based solely on his age, education, and RFC. If he can adjust to other work, then the individual's disability has ended and the ALJ will not make a finding about past relevant work.

## V. **The ALJ's Decision**

In the present case, ALJ Kenyon evaluated the evidence connected to Plaintiff's cessation of benefits. He did so by considering each of the sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.994(b)(5). The ALJ observed, "The most recent favorable medical decision finding that [Plaintiff] continued to be

disabled is the determination dated December 1, 2010. This is known as the 'comparison point decision' or CPD." (Doc. #6, *PageID* #49). At that time, Plaintiff had schizophrenia—a medically determinable impairment—that met Listing § 12.03. *Id.* at 50. At step one, the ALJ concluded that, as of April 27, 2015, Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. He found, at step two, that medical improvement occurred as of April 27, 2015. And, at step three, the medical improvement is related to Plaintiff's ability to work because, as of April 27, 2015, his impairments no longer met or medically equaled the same listing that was met at the time of the CPD. Because the ALJ found that Plaintiff had medical improvement related to his ability to work, the ALJ did not need to determine at step four whether any exceptions under 20 C.F.R. § 416.994(b)(3)-(4) apply.

At step five, the ALJ found that Plaintiff has continued to have a severe impairment or combination of impairments. Specifically, as of April 27, 2015, Plaintiff had the severe impairments of diabetes mellitus; deep vein thrombosis of the left leg; a history of seizures; depression; and anxiety. Turning to step six, ALJ Kenyon found that Plaintiff's residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of

> light work … subject to the following limitations: (1) standing and walking for four hours per day; (2) occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (3) no climbing of ladders, ropes, and scaffolds; (4) no work around hazards such as unprotected heights or dangerous machinery; (5) no driving of automotive equipment; (6) limited to performing unskilled, simple, repetitive tasks; (7) occasional

11

>      contact with co-workers and supervisors; (8) no public contact;
>      and (9) no jobs which would require written instructions and
>      limited to performing jobs which could be learned by
>      demonstration only.

(Doc. #6, *PageID* #52). In addition, he has no past relevant work. At step seven, the ALJ found that, beginning April 27, 2015, Plaintiff could perform a significant number of jobs in the national economy. Last, at step eight, the ALJ ultimately concluded that Plaintiff disability ended on April 27, 2015, and he has not become disabled again since that date. *Id.* at 56.

## VI. Discussion

In December 2010, the Social Security Administration reviewed Plaintiff's disability status and continued his benefits because he had schizophrenia, a medically determinable impairment that met Listing § 12.03. (Doc. #6, *PageID* #50). Less than five years later, in April 2015, the Administration reviewed his disability status again and found he was not under a disability. But Plaintiff disagreed and requested a hearing. A little over two years later, after a hearing, ALJ Kenyon affirmed the Administration's non-disability determination.

### A. The Listings

Plaintiff asserts that the ALJ failed to show medical improvement and failed to show that his symptoms—specific to Listing 12.03—diminished. This argument lacks merit.

ALJ Kenyon adequately considered Listing 12.03. He found, based on the recent evidence, that schizophrenia was not one of Plaintiff's medically determinable

12

impairments and, accordingly, no longer met or equaled Listing 12.03. He explained that the 2010 disability finding was based on the opinion of Dr. Hrinko, a consultative examiner. He compared Dr. Hrinko's opinion to recent medical records and accurately observed, "no treating or examining source has concurred with the aforementioned diagnosis since that time. Dr. Schulz, an examining source, found no evidence of a mental disorder. [Plaintiff's] current mental health treatment records indicate that he was treated for anxiety, depression, and problems with anger management." (Doc. #6, *PageID* #52) (internal citations omitted). He later reiterated, "Despite the fact that the claimant was previously found by the State Agency to meet the requirements for Section 12.03 (schizophrenia) of Appendix 1, no current treating or examining source diagnosed this condition." *Id.* at 54. Further, the record-reviewing psychologists' opinions support the ALJ's conclusion; they found that Plaintiff had an anxiety-related disorder but it was not severe. *Id.* at 549, 666.

Further, the ALJ discussed Plaintiff's recent mental-health records in more detail, noting, for instance, he receives treatment at a community mental health center for an adjustment disorder and an anxiety disorder. *Id.* at 50 (citing Exhibits 13F and 17F). He also received treatment at Rocking Horse Community Health Center for depression. *Id.* (citing Exhibits 8F, 14F, and 19F).

Although the ALJ did not explicitly compare Plaintiff's 2010 symptoms to his 2015 symptoms, his review of the "paragraph B" criteria plainly shows improvement. In 2010, Dr. Hrinko opined that Plaintiff's ability to understand and follow instructions based on memory skills was moderately impaired. By comparison, Dr. Schulz, in 2015,

13

indicated that Plaintiff was expected to be able to understand and follow instructions in a work setting within the borderline to low-average range of intellectual functioning. Based on Dr. Schulz's assessment and Plaintiff's limited education, the ALJ found he had only a mild limitation.

Dr. Hrinko found that Plaintiff's ability to relate with coworkers and supervisors was markedly impaired. In comparison, Dr. Schulz opined Plaintiff would likely have "some difficulties" in responding to coworkers or supervisors. Unfortunately, the ALJ's finding is unclear: "The claimant's impairments result in moderate/no limitation interacting with others." *Id.* at 51. It is not apparent what he meant. But, the ALJ's explanation suggests moderate limitation: Plaintiff was suspended in school for fighting, has a history of antisocial behavior (multiple felony convictions for check fraud and assault), and reported to Dr. Schulz that he has been fired because of anger outbursts.

Dr. Hrinko opined that Plaintiff's ability to maintain attention to perform simple and repetitive tasks was moderately impaired. The ALJ agreed. Dr. Schulz explained that Plaintiff was mentally capable of completing routine or repetitive activities of daily living at home, in the community, and on a job setting but was "likely to experience some objective performance concerns by employers." *Id.* at 394, 538.

Although the ALJ did not address Plaintiff's ability to withstand stress while discussing the Paragraph B criteria, he later acknowledged that Dr. Schulz found that Plaintiff could respond appropriately to work pressure. His opinion stands in stark contrast to Dr. Hrinko's opinion that Plaintiff's ability to withstand stress and pressures of employment was markedly impaired.

14

But the differences between the two evaluating doctors' opinions do not end there. In 2010, Dr. Hrinko indicated there was "clear evidence of auditory hallucinations." *Id.* at 393. In 2015, Dr. Schulz noted the opposite: "He did not present any hallucinatory, delusional, or psychotic symptoms. He did not present any obsessive thoughts, compulsions, ruminations, paranoid ideation, or intrusive recollections of traumatic experiences." *Id.* at 536.

Plaintiff's treatment notes from WellSpring also show improvement in his anxiety and angry behavior. For instance, Plaintiff's counselor noted, "Client is functioning but unemployable due to epileptic seizures. He is mobile; has very low rate of literacy but is capable of good comprehension if content is level-appropriate to him. He is well motivated to improve and his goals are well defined." *Id.* at 730.

Notes from Rocking Horse Community Health Center also generally show improvement, albeit with some lapses. For instance, on November 9, 2016, Dr. Anderson noted that Plaintiff "did not report any concerning symptoms of bipolar disorder flaring up." *Id.* at 811. Further, Plaintiff admitted he only took ten milligrams of Prozac rather than the prescribed 30 milligrams. *Id.* Unfortunately, only two weeks later, Plaintiff's symptoms dramatically changed. At his intake with Medical Services at Rocking Horse, Hector Suncin, M.D., indicated that Plaintiff was experiencing depressed mood, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, excessive worry, and fatigue. *Id.* at 786. Plaintiff reported, "they are trying to cut me off my SSI and its causing a lot of anxiety." *Id.* Dr. Suncin initially diagnosed bipolar disorder. However, at Plaintiff's next appointment, Dr. Suncin changed his diagnoses to mood disorder and

15

cannabis abuse. *Id.* at 784. In January 2017, Plaintiff reported that his racing thoughts slowed and Ability was helping his symptoms. *Id.* at 773.

In sum, although the record shows that Plaintiff continues to experience some symptoms of anxiety and problems with anger management, substantial evidence supports the ALJ's conclusions that Plaintiff's symptoms diminished, his severe impairments do not include schizophrenia, and his medical condition improved, such that his impairments do not meet the Listings.

      **B.**      **Residual Functional Capacity Assessment**

Plaintiff asserts that the ALJ's assessment does not adequately account for his limitations in concentration, persistence, or pace—specifically, "the ALJ failed to acknowledge that [Plaintiff] may require additional time off task and may be unable to stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." (Doc. #7, *PageID* #1475). Plaintiff emphasizes various references to, for example, diagnoses of depression, anxiety, and PTSD, and symptoms such as fatigue, racing thoughts, and excessive worry. He asserts that all of those, among others, "may cause problems with concentration; persistence, pace and may lead to additional time off task." *Id.* at 1474 (citations omitted).

ALJ Kenyon reasonably concluded that Plaintiff has moderate limitations in concentration, persistence, and pace. The ALJ observed that Plaintiff could only recall four random numbers forward and three in reverse. Yet, he was able to recall three of three unrelated objects after five minutes. He was able to perform serial 4s without error but struggled with simple arithmetic. He could not spell the word "house" backwards.

16

A review of the record reveals further support of the ALJ's finding. When Dr. Schulz asked how his mental condition interferes with his ability to work, Plaintiff responded, "It shouldn't interfere with me going to work." (Doc. #6, *PageID* #533). And, his work speed and performance were "good." *Id.* Dr. Schulz opined that Plaintiff "is mentally capable of completing routine or repetitive ADL tasks both at home and in the community or on a job setting. However, given his performance today on formal mental status evaluation tasks he is likely to experience some objective performance concerns by employers." *Id*. While his opinion is somewhat vague, the record-reviewing psychologists opined Plaintiff had mild difficulties in maintaining concentration, persistence, or pace. *Id.* at 559, 676.

ALJ Kenyon's residual functional capacity assessment limits Plaintiff to performing unskilled, simple, repetitive tasks. (Doc. #6, *PageID* #52). Further, he is limited to performing jobs that can be learned by demonstration only; he cannot perform jobs that require written instructions. *Id.* These limitations adequately account for Plaintiff's moderate limitations in concentration, persistence, and pace. Although Plaintiff, in his words, "may require additional time off task and may be unable to stay alert, or work at a consistent pace, even at a simple, unskilled, routine job," Doc. #7, *PageID* #1475, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the

decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997)."). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d at 773 (citing *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984))).

## IT IS THEREFORE RECOMMENDED THAT:

1. The ALJ's non-disability decision be affirmed; and

2. The case be terminated on the Court's docket.

April 2, 2019 *s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).